Gilbert R. X. HALL

v.

STATE OF MARYLAND et al.

Gilbert R. X. HALL and James Edw. Carter,

v.

Marvin MANDEL, Governor, et al.

James Edw. CARTER

v.

Harold M. BOSLOW, Director, Patuxent.

James Edw. CARTER and Gilbert R. X. Hall

v.

Harold M. BOSLOW, Director of Patuxent.

James E. CARTER, Inmate, Patuxent Institution, et al.

v.

Robert J. LALLY, Secretary, Maryland Department of Public Safety and Correctional Services, et al.

Vernon LIGHTFOOT

v.

Warden, Ralph WILLIAMS.

Civ. Nos. 71–37–K, 72–60–K, 72–295–K, 72–417–K, 72–642–K and K–74–1.

United States District Court, D. Maryland.

Feb. 8, 1977.

---

Charles F. Morgan, Baltimore, Md., for all plaintiffs other than plaintiff Hall.

Gilbert R. X. Hall pro se.

Francis B. Burch, Atty. Gen. of Md. and Henry J. Frankel, Asst. Atty. Gen. of Md., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge:

In these six cases[1] plaintiffs seek declaratory and injunctive relief. Defend-

1. All of the named plaintiffs except plaintiff Hall are represented by counsel who was until recently Director of the Prisoner Assistant Project of the Baltimore Legal Aid Bureau.

ants are officials of the Maryland State Department of Public Safety and Correctional Services. Plaintiffs allege that defendants have failed to provide adequate law library facilities for, and legal assistance to, indigent inmates in Maryland's confinement institutions including Patuxent, and thus have unconstitutionally infringed upon plaintiffs' rights to access to the courts, discriminated against plaintiffs because of their indigency in violation of the equal protection clause of the Fourteenth Amendment, and denied plaintiffs due process of law. Defendants have moved for summary judgment. Plaintiffs have in turn filed cross-motions for summary judgment.

## FACTS

The facts in these cases are not in dispute. The following relevant and material facts speak for themselves:

1. As of August 1976, the average daily population of the Maryland Division of Correction was approximately 7100 prisoners. The total number of prisoners who, it was expected, will be confined in the Division of Correction for the period August 1976-August 1977 was in August 1976 estimated at approximately 13,500. (*See* Stipulation of Counsel dated May 22, 1975, ¶ 1, hereinafter cited as "Stipulation I"; Plaintiffs' Proposed Findings of Fact, ¶ 2, hereinafter cited as "Plaintiffs' Facts"; Defendants' Proposed Findings of Fact, ¶ 3, hereinafter cited as "Defendants' Facts".) Inmates were housed throughout the several confinement institutions within the Division of Correction of the State of Maryland. *See* chart reproduced *infra* as Appendix A to this opinion and stipulated to by the parties; Stipulation I, Exh. 1.

2. During the fiscal year, July 1, 1972, through June 30, 1973, of the 4508 prisoners received by the Division of Correction, 3037 (67%) were convicted in Baltimore City. During the previous fiscal year, 2477 of 3867 prisoners received by the Division were convicted in Baltimore City (64%). During the most recent fiscal year (1975), 2502 of 4287 prisoners received were convicted in Baltimore City (58%). (Stipulation I, Exh. 2, ¶ 2; Plaintiffs' Facts, ¶ 3.)

3. At any given time, about one-third (33⅓%) of the prisoners in the Maryland prison population have one or more detainers outstanding against them. (Stipulation I, Exh. 2, ¶ 3.)

4. Plaintiffs and many other Maryland prisoners are indigent, and many of them are unable or find it financially difficult to retain private counsel or to purchase law books and other legal research materials

---

Hall has proceeded *pro se* as a named plaintiff in three of these six cases. In Civil No. 72–642–K, in which Hall is not a named plaintiff, a class order is in existence. The class is defined to include "all inmates who are confined, and who may be confined during the pendency of this action, in the Maryland Division of Correction and at the Patuxent Institution." As of the date of the filing of this opinion this Court is informed that all of the named plaintiffs in these six cases are confined either in a Maryland prison or at Patuxent, other than plaintiff Hall who is one of the named plaintiffs in Civil Nos. 72–60–K and 72–417–K, and the sole plaintiff in Civil No. 71–37–K. At this time Hall is the only plaintiff seeking damages as well as equitable and declaratory type of relief for alleged violation of his rights to prison law libraries, legal assistance, access to courts, and the like. Hall has not responded to written notice from this Court giving him the opportunity to provide details of his contentions upon which he has based, on those grounds, claims for damages and other relief. In addition, since

Hall is no longer in custody, his individual claims for equitable relief are moot. *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *Brooks v. Cousins,* 527 F.2d 472 (4th Cir. 1975); *see Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). *See also Board of School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). In any event, all of Hall's said complaints in these cases relating to the issues under consideration in this opinion will be dismissed since this Court holds herein that defendants have not violated any rights of any of the plaintiffs in connection with those issues. Hall has also sought, in one or more of the three cases in which he is a named plaintiff, other relief not related to issues pertaining to law libraries, legal assistance, access to the courts, and the like. All of Hall's such other unrelated quests for relief have been dismissed prior to the date of the filing of this opinion.

necessary to provide themselves and other inmates with legal assistance, counsel and advice. (Stipulation I, Exh. 2, ¶ 4.)

5. The vast majority of Maryland's prison inmates are without any legal training or education and cannot render adequate legal assistance to themselves or other prisoners. There are some inmates who attempt to give legal assistance to other prisoners.[2] (Stipulation I, Exh. 2, ¶ 5.)

6. The median level of education for inmates confined in the Division of Correction is the sixth grade. Thirty-five percent (35%) of Maryland prisoners are functionally illiterate with a fifth grade reading level or below. Plaintiff Carter reached the eleventh grade, and plaintiff Morgan has completed two years of college. (Stipulation I, Exh. 2, ¶ 6.)

7. There are no law libraries in any of the institutions in the Division of Correction or at Patuxent Institution. No steps have been taken by either agency to obtain funding for law libraries. In some institutions and at Patuxent, there are some miscellaneous legal research materials. (Stipulation I, Exh. 2, ¶ 8.)

8. There are no lawyers, law students or paralegals employed by the Division of Correction or Patuxent Institution to provide legal advice and assistance to inmates in the preparation and litigation of their cases in the state and federal courts. (Stipulation I, Exh. 2, ¶ 9.)

9. There are no programs in the Division of Correction or Patuxent Institution to train inmates to provide legal assistance to other inmates. (Stipulation I, Exh. 2, ¶ 10.)

10. There are no services provided by the Division of Correction or Patuxent Institution for inmates who wish to do legal work (for example, there is no physical space set aside for them to work or to keep their legal materials; there are no typewriters, pens, pencils, envelopes or stamps provided for legal work; and there is no writing paper or copying service provided for legal work). (Stipulation I, Exh. 2, ¶ 11.)

11. Patuxent Institution does not provide inmates in committed or diagnostic status with legal services of any kind of concerning their rights during evaluation or preparation for defective delinquency commitment or redetermination proceedings. (Stipulation I, Exh. 2, ¶ 12.)

12. In the Division of Correction and at Patuxent Institution, there is a "publisher's only" policy in effect. Under this policy, a prisoner may only receive books and other reading materials, including law books and legal research materials, from a publisher or book store. (Stipulation I, Exh. 2, ¶ 13.)

13. Division of Correction Regulation No. 250–1 (March 29, 1974), which sets forth policy and procedure applicable to all confinement institutions within the Division of Correction of the State of Maryland with regard to incoming and outgoing inmate mail, provided as follows at the time of its promulgation:

a. An inmate may write sealed letters to a court, judge, clerk of court, attorney-at-law, elected or appointed government official, such as members of Congress or the Maryland General Assembly, Governor, Attorney General, Department of Public Safety and Correctional Services or the Inmate Grievance Commission. All other outgoing correspondence must bear the name of the inmate and the return address of the institution on the envelope. This mail will be placed unsealed in the mail drop and will be subject to inspection. Proper postage must be affixed to the envelope, except in the case of an indigent inmate's legal mail.

2. Counsel for plaintiffs contend that prisoners who try so to aid their fellow prisoners "are restricted by not having available to them adequate legal materials, legal education, legal experience and legal advice, the necessary space and time in which to work and the approval and recognition of the prison system." However, in this Court's opinion, even conceding the existence of such restrictions, they do not mount up to such an unreasonable interference as to constitute denial of the right of access to the courts.

b. If the inmate desires to mail money from his account with the letter, it will be necessary for him to forward the envelope and letter, together with the proper withdrawal slips, to the mail inspector in an unsealed envelope. The mail inspector will obtain the necessary check, enclose it with the letter, and mail.

c. All incoming mail will be opened for inspection before delivery to the inmate. Mail from any of those mentioned in par[a] 4a above to whom sealed letters may be sent will be inspected for contraband only and forwarded promptly to the inmate. Mail from all other sources shall be subject to additional review to determine appropriateness. Such mail may be returned to the sender if, in the opinion of the institution, such mail falls into one of the following categories:

(1) Inflammatory or advocates escape, violence, disorder, or assault.
(2) Directly or indirectly threatens the security, safety or order of the institution or its personnel.
(3) Contains coded or otherwise undecipherable language that prevents the adequate review of the material.

d. Packages may be received only when prior written approval has been given; any package received without such approval shall be refused and returned to the sender.

e. An indigent inmate will be provided with sufficient first-class postage for seven (7) letters per week.

f. The inmate shall be given written notice of mail that has been withheld under par 4c above. The inmate may appeal such action by letter to the Commissioner.

g. There shall be no restrictions placed on the inmate's correspondence for disciplinary purposes unless the inmate specifically abuses this privilege.

h. No inmate will be permitted to correspond with an inmate in another institution within the Division of Correction without the express permission of the Managing Officers of the institutions involved. Any such letter approved will be subject to the usual mail inspection outlined in par 4a above.

That regulation has subsequently been changed to include the following provisions:

If, after a reading by the authorized institution official, of any mail, publication, newspaper, periodical, literature or other written material of any kind, the official proposes that such material, or any portion thereof, be taken or kept from an inmate because of its contents, the inmate shall be entitled to the following procedures:

1. The inmate shall be furnished a written statement that certain named or described materials are sought to be taken or withheld from the inmate and setting forth the reason(s) for the proposed action. If the materials sought to be taken or withheld from the inmate were mailed or delivered to the inmate from a person outside the institution, any such person shall also be furnished with the written statement described above. The written statement shall be served on the inmate and any other such person no more than forty-eight (48) hours after the proposed decision to take or withhold the materials from the inmate.

2. When materials are withheld, the determination shall be made by the Warden and the Assistant Warden for Custody and Treatment or their designees.

3. The inmate will be given a reasonable time to respond to the decision to withhold the materials, in writing, to the Warden and his Committee.

4. In its review of the materials, the Warden and his Committee shall consider, and adopt where appropriate any existing alternative(s) short of taking or withholding written materials from the inmate.

5. No more than seven (7) days after the receipt at the institution of the materials under consideration, the Warden and

his Committee shall make a written report of its decision, to include a summary of the evidence, the decision, the reason for the decision and the facts upon which the decision is based. The written report shall be given to the inmate and to any person outside the institution who mailed or delivered the written materials to the inmate.

6. The inmate and any such person shall be informed that if they object to the decision of the Warden and his Committee, either of them may appeal the decision to the Commissioner of Corrections, provided that such an appeal is made in writing, stating the reasons for the appeal, no more than five (5) days after service of the decision on them.

7. If the final decision of the Warden and his Committee, and the Commissioner of Corrections in cases where an appeal is taken, is that materials which have been mailed or delivered to an inmate from a person outside the institution will be withheld from the inmate such materials shall be promptly returned to the sender.

See *Hopkins v. Collins,* 411 F.Supp. 831, 834–35 (D.Md.1976). In *Hopkins,* this Court entered the following Order:

1. It is unconstitutional for the defendants to use as standards concerning the withholding of mail addressed to inmates of institutions operated by the State of Maryland Division of Correction any of the following:

a. that which is "inflammatory";

b. that which "directly or indirectly threatens the security, safety or order of the institution or its personnel".

2. It is unconstitutional for the defendants to restrict the reading materials which a prisoner may receive or read unless they show that any such restriction furthers a substantial governmental interest such as security, order or rehabilitation, and is no greater than is necessary or essential to the protection of that interest.

\*   \*   \*   \*   \*   \*

4. It is unconstitutional for the defendants to restrict receipt or reading of any mail, publication, newspaper, periodical, literature, or other written material of any kind unless the prisoner and the person (the "correspondent") who mailed or delivered the same to the prisoner are afforded at least the following additional elements of procedural due process:

a. The prisoner and the correspondent shall be furnished a written statement that, if either or both so request, the person or persons so requesting are entitled to appear at a hearing before the Warden and his committee, or their designees, to contest the proposed decision.

b. If a hearing is requested by either the prisoner or the correspondent, such a hearing shall be held with reasonable promptness.

c. At the hearing, the prisoner if he appears thereat, and the correspondent if he appears thereat, shall have the right (1) to be informed of the facts which have been advanced in support of the proposed decision to restrict the reading materials; (2) to have a reasonable opportunity to contest or deny those facts; (3) to present any factual corrections and reasons why the reading materials should not be restricted; and (4) to call witnesses, introduce documentary evidence and confront and cross-examine adverse witnesses for the purpose of presenting relevant and material evidence unless to do so would create risk of reprisal or undermine authority or endanger the security, order, discipline or safety of the institution. If the committee decides not to permit the prisoner or the correspondent the opportunity to call a particular witness, present documentary evidence or confront and cross-examine an adverse witness, the committee must state in writing its reason for its decision. The committee may record its reason *in camera* if it specifies the reasons for so doing and makes its reasons for such restriction and for such *in camera* recording available for court review.

14. Division of Correction Regulation No. 260–1 (March 22, 1974), which sets forth policy and procedure applicable in all cor-

rectional institutions within the Division of Correction of the State of Maryland with regard to the obtaining of legal services by inmates within those institutions, provides as follows:

a. The Division of Correction has no prohibition concerning inmates reading or possessing law books or legal materials. Such use or possession may, however, be subject to institutional rules or directives because of space, fire, safety or security restrictions.

b. The Division policy will be that an inmate may assist another inmate in preparing a letter or petition to a court. No person or institution will interfere or in any way hamper an inmate's access to the judicial process.

c. An inmate who has a legal problem should be referred to one or more of the following individuals or agencies:

(1) The inmate's Classification Counselor. He will provide guidance in obtaining legal assistance.

(2) The inmate's attorney.

(3) The Legal Aid Bureau, Inc. may be contacted by mail. Legal Aid representatives are in the institutions on a regular basis.

(4) The Prisoners Assistance Project of the Legal Aid Bureau, Inc., 341 N. Calvert Street, Baltimore, Maryland 21202 may be contacted by mail.

(5) The court in any city, county, or state may be contacted by mail.

(6) The State Public Defender's Office, 800 Equitable Building, Baltimore, Maryland 21202 may be contacted by mail. This Office may provide assistance concerning direct appeals of criminal convictions, petitions for post-conviction relief and petitions for habeas corpus relief in the State courts.

(7) Any other lawyer who is authorized to practice, or his designated representative.

d. Inmates may be advised that:

(1) Counsel is appointed by the courts to represent indigent defendants in direct appeals from criminal convictions to both the Court of Special Appeals and the Court of Appeals of Maryland.

(2) Counsel is also appointed by the courts to represent indigent inmates in proceedings under the Uniform Post-Conviction Procedure Act (Article 27, Section 645(a), ACM).

(3) In the event an inmate corresponds with the U.S. District Court (Maryland) and requests legal assistance, and/or files any type of legal proceedings, the U.S. District Court will appoint counsel to represent the inmate when the court considers such representation necessary.

e. In addition to the legal assistance available, the Inmate Manual (DCM 210–1) also indicates that an inmate has uncensored and unlimited mailing privileges to the Governor, Attorney General, Inmate Grievance Commission, the Commissioner, Court of Law, or designated lawyers.

f. Inmate legal proceedings are normally filed as indigent cases, and the State of Maryland provides funds for the legal services. Funds may also be provided the Legal Aid Bureau, Inc. by the local, state, or federal government, and other sources to insure that an indigent receives legal services when necessary.

15. Patuxent Institution issued and promulgated Rules and Regulations appearing as Chapter 7, Section A, "Patients' Handbook", which provides, in substance, that the patients at the institution may write sealed letters to any court, judge, clerk of court, attorney at law, any elected or appointed officials, Governor, Attorney General, Department of Public Safety and Correctional Services and the Inmate Grievance Commission. In addition to the policies stated in the "Patients' Handbook", Patuxent Institution does not object to a patient assisting another in the preparation of a letter, petition, or any type of complaint addressed to any court, judge or attorney in the state or country. It is the

policy of the institution not to interfere with or in any way hamper an individual's access to the judicial process. Patients are not prohibited from reading, receiving or possessing law books or legal materials, subject, of course, to institutional concerns pertaining to space, fire, safety and security. Furthermore, if a patient is faced with a legal problem, he is advised to communicate with his unit treatment team and social worker who, in turn, will communicate with the desired court, judge or attorney. (Affidavit of Forrest Calhoun, Jr., Superintendent of Patuxent Institution. 5/15/75, filed as Defendants' Exh. 5 of 5/22/75.)

16. The Office of the Public Defender of the State of Maryland (MPD) was, as of May 22, 1975, comprised of 108 staff attorneys assigned throughout the twelve districts into which the District Court system of the State of Maryland is divided. It was anticipated as of May 22, 1975 that on July 1, 1975 the number of said staff attorneys would increase to 123. The MPD also includes 916 panel attorneys (local members of the bar under contract with the MPD to handle such cases); 61 investigators; and 30 law students hired on an hourly basis. (Transcript of Testimony of Alfred J. O'Ferrall, III, 5/22/75, at 7–9, hereinafter cited as "O'Ferrall Tr.") The Collateral Proceedings Division of the MPD consisted on May 22, 1975 of six lawyers and a supportive staff (O'Ferrall Tr. at 10). The Inmate Services Division of the MPD (ISD) consists of its director, Melvin C. Paul, and a staff attorney, both of whom are Assistant Public Defenders; additional attorneys; four legal assistants; and a secretary. The project director is responsible for the overall management of the project. The staff attorney gives legal advice to inmates either directly or through the paralegal investigators whom he also supervises in the drafting of writs and petitions. The paralegal investigators are responsible for interviewing inmates at the institutions. (O'Ferrall Tr. at 11; Stipulation I, Exh. 6, ¶ (d); Affidavit of Melvin C. Paul dated 3/31/76.) Additionally, in the event an "unreasonable back-log of cases" presents itself, the ISD has available to it the staff of the MPD as a resource for legal assistants. (Affidavit of Paul dated 3/31/76.) The ISD operates under a three-year LEAA grant which will continue through 1977. Thereafter, it is anticipated that the State of Maryland will finance the ISD. (Transcript of Testimony of Melvin C. Paul, 2/17/76, at 29–30, hereinafter cited as "Paul Tr.").

17. The Baltimore Legal Aid Bureau Prisoner Assistance Project (hereafter ("PAP") is a federally-funded program which provides legal and quasi-legal services for indigent Maryland state prisoners. PAP began in 1970 as a volunteer program for law students working under the supervision of a Legal Aid Bureau attorney. PAP was subsequently able to obtain funding from the Baltimore Model City Agency which since then has become a part of the Baltimore Urban Services Agency. That funding was terminated by that Agency approximately a year ago. PAP is now funded through the general Legal Aid Bureau budget.

As of August 11, 1976, PAP has the following staff: 1 director (attorney); 2 staff attorneys; 2 paralegals; 2 law students; and 1 secretary/office manager. (Stipulation II, ¶ 1(A); Plaintiffs' Facts ¶ 10(a).) The director is responsible for the overall supervision and administration of PAP and is primarily involved in his practice with federal civil rights litigation. The staff attorney carries his own caseload of clients as well as having the principal responsibility for supervising the work of the legal assistants and law students. One of the legal assistants is responsible for client intake, client records and the entire caseload of clients with domestic legal problems (such as divorce, custody, adoption, etc.). The other legal assistant and the law students maintain their own caseloads of clients and engage in interviewing, doing legal research, writing letters, making telephone calls, and working to resolve the legal and quasi-legal problems of the clients. (Stipulation I, Exh. 7, ¶ 3.)

18. Upon his entry into the Division of Correction of the State of Maryland, an

inmate receives a card which contains the following information:

A Division has been established within the Public Defender's Office to provide inmate services. This Division of Inmate Services, along with all other aspects of the Office of the Public Defender, is *NOT* part of the court system, the Division of Correction, Patuxent Institution, any State's Attorney's Office, Attorney General's Office or any other agency of the State of Maryland which prosecutes criminal actions or is involved with the imprisonment of inmates. The Public Defender Inmate Services was created to help you with your legal problems IN ANY MATTER DEALING WITH YOUR CRIMINAL CHARGE.

The Public Defender CANNOT represent parties at any:
1. Parole hearings.
2. Adjustment hearings.
3. The Inmate Grievance Commission.
4. Any domestic or civil court matters.

If you have problems involving those areas, you should contact:

Prisoners Assistance Project
341 North Calvert Street
Baltimore, Maryland 21202

The Office of the Public Defender was created by the Legislature of the State of Maryland to provide legal representation to persons charged with a crime who cannot afford an attorney.

The Public Defender WILL PROVIDE assistance and representation to inmates who have the following legal problems:
1. Detainers.
2. Representation at parole revocation hearings if counsel is requested.
3. Application for post-conviction relief.
4. Habeas corpus proceedings.
5. Other *criminally* related matters.

If you have any problems regarding the above, please contact the following:

Office of the Public Defender
Inmate Services Division
800 Equitable Building
Baltimore, Maryland 21202
Telephone—383–3050 or 383–3051

(Defendants' Exh. 3, hearing of 2/17/76.)

19. Maryland prisoners may be confronted with legal problems while they are confined in the Division of Correction and at Patuxent Institution, and they may have meritorious and valid legal claims and defenses to be made. Those legal problems, claims and defenses may arise from any of the following:

(a) challenges to the legality or constitutionality of convictions and sentences;

(b) defective delinquency commitment and redetermination proceedings;

(c) outstanding detainers;

(d) prison conditions and prison officials' administrative decisions or conduct;

(e) parole revocations and parole releases;

(f) personal, domestic and other civil matters. (Stipulation I, ¶ 7.)

20. Legal assistance in connection with each of the above categories of cases is made available to inmates confined within the Division of Correction and Patuxent Institution on the following bases:

## A. CHALLENGES TO THE LEGALITY OR CONSTITUTIONALITY OF CONVICTIONS AND SENTENCES

### 1. State Court Proceedings

The MPD operates under the authorization of Md.Ann.Code art. 27A. In general, the MPD represents persons in cases in which counsel are constitutionally required and in situations enumerated in article 27A. Specifically, the trial division of the MPD provides representation of defendants at criminal trials, including pretrial work, new trial motions, sentence motions and filing appeals. The appellate division of the MPD provides representation of defendants on direct appeals to the Court of Special Appeals of Maryland, on certiorari to the Court of Appeals of Maryland and on applications for leave to appeal from post-conviction and defective delinquency proceedings, when in the judgment of the division, such a discretionary appeal should be made.

The Collateral Proceedings Division of the MPD provides representation in state court in connection with, *inter alia*, habeas corpus and coram nobis petitions and post-conviction proceedings. (Stipulation I, Exh. 6, ¶¶ a–c.)

The Inmate Services Division of the MPD, a federally funded project which commenced operation on January 1, 1975, provides assistance and representation to any inmate who contacts said office with regard to legal problems in connection with applications for post-conviction relief, state habeas corpus proceedings and other criminally related matters. (Stipulation I, Exh. 6, ¶ (d).) When said office receives an inquiry either through an inmate or his classification counselor, the ISD contacts said inmate, and, if it discovers "that there is a reasonable request on his part", will file a writ of habeas corpus or a petition for post-conviction relief or offer said inmate other assistance. (O'Ferrall Tr. at 12–13.) PAP attorneys do not represent prisoners in state post-conviction, habeas corpus, coram nobis, and sentence review proceedings, or, with the exception of about five (5) cases per year, in federal habeas corpus proceedings.

PAP staff members (attorneys, law students and paralegals) do not counsel or advise prisoners about the substance or merits of their possible challenges to convictions or sentences except in about 50 cases each year. That advice may be given in person, but more often, it is given through a personal letter or a form letter in response to a prisoner's written request for specific information. The PAP does not assist prisoners in preparing *pro se* petitions for federal or state court relief.

PAP has prepared form letters and instructions which are sent to prisoners who request assistance in connection with challenges to convictions or sentences. Those cases are also referred to the Public Defender's Office. The forms which are mailed to prisoners do not provide advice about the substance or merits of a prisoner's individual case but explain the Maryland and federal court systems and describe the procedures which relate to the filing of petitions. In 1974 and 1975, the PAP mailed about 339 and 280 of these forms to prisoners, respectively. (Stipulation of Counsel dated 3/2/76, hereinafter cited as "Stipulation II", ¶ 1(c)(1). *See also* Stipulation I, Exh. 7, ¶ 5(d).)

The University of Baltimore Law School program is presently in operation at the Maryland Division of Correction Reception, Diagnostic and Classification Center which is located in the Maryland Penitentiary building in Baltimore. The Reception Center has an average daily population of 600 to 650 prisoners, and its function is the screening and classification of the new prisoners who enter the Division of Correction each year.

The University of Baltimore program consists of four students who are present at the Reception Center between 10:00 A.M. and 2:00 P.M. three days per week. There is a faculty advisor and the students receive credit toward graduation for their work in the program.

Prisoners are interviewed by the students after appointments are made through Reception Center classification officers. The only prisoners who are scheduled for interviews are those prisoners who are seeking information about direct criminal appeals or reconsideration or review of sentence. The students do not give prisoners any legal advice; rather, the students explain to the prisoners their present legal situations and the various options available to them. For example, a student would not recommend sentence review over sentence reconsideration, or vice versa, but would explain each alternative to the prisoner.

Typically, those prisoners are also represented, or have been represented at their trials, by Public Defenders or private lawyers. The students may contact those attorneys or other interested persons on behalf of the prisoners. The program provides forms for appeals, sentence reviews (by three-judge panels) and sentence reconsideration (by the sentencing judge). The students assist in the preparation of the forms, and supply inmates with envelopes

for the mailing of those forms to the appropriate court. (Stipulation I, Exh. 8; Stipulation II, p. 6.)

During the September through December 1974 school term, the program interviewed 70 inmates: appeals (33); sentence reviews (4); and sentence reconsiderations (33). The program operates fully when the Law School is in session and with reduced staff during examination periods, holidays and the summer months. (Stipulation I, Exh. 8.)

### 2. Federal Habeas Corpus Proceedings

The MPD does not provide assistance or representation in connection with federal habeas corpus proceedings, except that an attorney on the staff of the MPD may accept an appointment from a Judge of this Court to represent an indigent individual in this Court at federal expense, if the matter arises out of, or is related to, an action pending or recently pending in a court of criminal jurisdiction of the State of Maryland. (Stipulation I, Exh. 6, ¶ (d); *see also* O'Ferrall Tr. at 4–6.).

The ISD of the MPD is by statute limited to representing inmates in the Courts of the State of Maryland. However, upon request the ISD will assist an inmate in the filling out of federal habeas corpus forms and will provide him with some advice in connection with factual and legal issues present in connection with the same (Paul Tr. at 6–10), but will not file a memorandum of law in such a case (Paul Tr. at 61). As of February 17, 1976, no member of the staff of the ISD had entered his appearance in any federal court case in connection with any federal habeas corpus petition, but had in the year preceding February 17, 1976 assisted prisoners in the filing of approximately six such petitions. (Paul Tr. at 61). However, as of March 1976, the ISD staff was representing two prisoners in this federal court in connection with federal habeas petitions

filed by those inmates. (Affidavit of Melvin C. Paul dated 3/76.)

An indigent who seeks the assistance of the MPD in connection with a federal habeas corpus petition and who had not been previously represented by the MPD receives the same assistance in connection with the filing of a federal habeas corpus petition as an inmate previously represented by the MPD. (Paul Tr. at 12.) To the knowledge of Melvin C. Paul, Esq., Assistant Public Defender, no individual who has requested the assistance of the MPD in connection with a federal habeas corpus petition has been denied assistance on the grounds that said inmate was not indigent. (Paul Tr. at 14, 15.)

The PAP, as previously noted, provides representation in federal habeas corpus proceedings in five or less cases per year, provides advice in such cases in fifty or less cases per year, provides counseling, does not assist prisoners in preparing *pro se* petitions in connection with such petitions, but does provide prisoners with certain forms explaining the Maryland and federal court systems and describing the procedures for the filing of federal habeas corpus petitions. *See* p. 765, *supra.*

### B. DEFECTIVE DELINQUENCY COMMITMENT AND REDETERMINATION MATTERS

Legal assistance in connection with defective delinquency commitment to Patuxent and redetermination proceedings [3] was formerly provided by the Collateral Proceedings Division of the MPD (O'Ferrall Tr. at 11). At present, any inmate who is confined at the Patuxent Institution awaiting a defective delinquency hearing or who has a right to ask in the near future for a redetermination proceeding in connection with his continued confinement at Patuxent may be represented by the Mental Health

---

**3.** Under Md.Ann.Code, art. 31B, § 10, prisoners committed to Patuxent Institution as defective delinquents are entitled to periodic redetermination hearings. In order to obtain a redetermination hearing, a person must request same by petition to the Court. The MPD does not

counsel or advise prisoners on their eligibility for redetermination hearings or assist them in filing *pro se* petitions for redetermination. (Paul Tr. at 24; Stipulation I, Exh. 2, ¶ 12; Plaintiff's Facts, ¶ 33.)

Division of the MPD, regardless of whether said inmate has had prior contacts with the MPD, provided the inmate is "indigent". (Paul Tr. at 21–22.) During the past 2½ years preceding March 29, 1976, there have been "virtually no" prisoners who have sought legal representation from the MPD office for initial defective delinquency commitment hearings and redetermination hearings and who have been denied such representation because those prisoners were not indigent. (Stipulation contained in letter to this Court from Charles F. Morgan, Esq., dated March 29, 1976.) Usually, any individual who is subjected to an upcoming defective delinquency proceeding is arraigned by the state court in which that proceeding is calendared. At such arraignment he has an opportunity to request that counsel be appointed for him. If he so requests, the Court notifies the MPD and counsel from the MPD provide representation in the determination hearing and in any subsequent redetermination hearing. In other cases, assistance in connection with a redetermination hearing is ordinarily furnished if an individual writes to the MPD requesting such assistance. (Paul Tr. at 24.)

The PAP does not provide legal assistance in connection with defective delinquency or redetermination hearings, but instead refers requests to the MPD. (Stipulation II, ¶ 1(C)(2).)

## C. DETAINERS

The ISD of the MPD acts as a "clearinghouse" for all intrastate detainers lodged against Maryland prisoners. The Division of Correction notifies the ISD of all such detainers. A paralegal employed by ISD, using form letters, in turn writes to an inmate against whom such a detainer has been lodged to determine whether the inmate desires information in connection with the same. (O'Ferrall Tr. at 15–17; Paul Tr. at 26–28.) When an inmate in turn supplies information to the ISD concerning his detainer, the ISD contacts the State's Attorney for the appropriate county to obtain further information concerning the status of the detainer. After such information is received, the ISD writes to the inmate, again by form letters, informs him of the status of the detainer, and indicates that if the inmate needs additional information he should contact the District Public Defender for the county in question. The ISD itself does not supply representation at the hearing on the detainer in question, but arranges for someone within the State Public Defender system to represent the inmate in question. (Paul Tr. at 28–31.) If a detainer cannot be resolved administratively by the Division, the indictment on which the detainer is based is set for trial and the representation of the prisoner involved is assigned to a Public Defender in the jurisdiction in which the indictment was filed. (Affidavit of Melvin C. Paul dated 3/76.) Although the ISD, as noted *infra* and *supra*, does not ordinarily handle federal habeas corpus proceedings or federal civil rights actions, the ISD is able to supply information in connection with a federal court proceeding when detainers become at issue. (O'Ferrall Tr. at 16–17.)

As to interstate detainers, the record discloses that MPD has provided assistance to prisoners in a small number of cases each year. (Paul Tr. at 83–84; Plaintiffs' Facts, ¶ 40.) The PAP provides advice and assistance with regard to interstate detainers and some intrastate detainers, particularly those which are from outside Baltimore City and are not for escape charges. All detainers based on escape charges and charges in Baltimore City are referred to the Public Defender's office. In the detainer cases which are accepted by PAP, the only assistance provided is in attempting to dispose of the detainer administratively or bringing the case to the attention of the court, prosecutor and Public Defender's office for a hearing or trial. PAP attorneys do not represent prisoners in court on detainer cases. In 1975, PAP provided assistance of this kind in about 140 detainer cases. (Stipulation II, ¶ 1(C)(3).)

## D. PRISON CONDITIONS AND PRISON OFFICIALS' ADMINISTRATIVE DECISIONS OR CONDUCT

The ISD does not provide legal assistance or representation in connection with either federal civil rights actions or Inmate Grievance Commission hearings and appeals. Nor does the ISD provide inmates with copies of trial transcripts or copy other legal research materials upon request by prisoners. Further, the ISD does not provide inmates with assistance in cases involving prison conditions and/or conduct of prison officials alleged to be violative of law. (Stipulation I, Exh. 6, ¶ (d)(2)–(4), (6).) When, however, a state prisoner raises an "urgent" complaint concerning alleged lack of proper medical care or alleged illegal conditions, the ISD will either send one of its legal assistants, or, if no such assistance is available, then an investigator to interview the complainant and other involved individuals at the institution in question. (O'Ferrall Tr. at 22–24, 31.) In such cases, after the investigator or legal assistant assigned to the case makes his report, the ISD will refer the matter to the proper agency so that appropriate action may be taken. (*Id.* at 33–34.)

In a case in which an inmate approaches the ISD for assistance in filing a proceeding pursuant to 42 U.S.C. § 1983, and asks for advice and help to prepare a complaint, the ISD informs such inmate that it cannot aid him and suggests that he contact the PAP, his classification counselor, or the Inmate Grievance Commission (Paul Tr. at 15–19). As a follow-up, the ISD will write a letter to the PAP, enclosing a copy of the individual's inquiry and suggesting that the ISD will appreciate it if the PAP will lend assistance to the individual. (Paul Tr. at 18–19.)

The ISD does not represent inmates in connection with Inmate Grievance Commission hearings (Paul Tr. at 78–79), or appeals from such hearings (*id.*).

The MPD provides inmates in Maryland institutions with assistance with regard to questions about transcripts or other papers such inmates may desire to obtain (Paul Tr. at 54); and with regard to obtaining jail time credits, either administratively or by a court petition. (Paul Tr. at 55–56; *see id.* at 71–72.)

PAP attorneys (sometimes with co-counsel from outside the Legal Aid Bureau) represent prisoners in federal § 1983 actions, federal habeas corpus petitions and state court proceedings relating to prison conditions and administration. Since 1971, PAP attorneys have represented prisoners in at least twenty section 1983 cases. Four of those cases were initiated in 1971, five in 1972, three in 1973, seven in 1974, and one in 1975. In nine of those cases, attorneys not with PAP entered their appearances as co-counsel with PAP attorneys. PAP attorneys have represented prisoners in about one federal habeas corpus proceeding and in about one state court proceeding relating to prison conditions and administration each year since 1972.

PAP does not provide advice or counseling to prisoners seeking to file *pro se* 1983, federal habeas corpus or state court cases challenging conditions of confinement, administrative decisions or official misconduct, except with regard to providing representation in about three cases each year in which *pro se* pleadings are prepared and except in a few other instances each year in connection with copying court decisions or pleadings requested by prisoners and sending them to them. (Stipulation II, ¶ 1(C)(4)(d)–(e).)

In both 1974 and 1975, PAP attorneys, law students or paralegals represented prisoners at about 50 Maryland Inmate Grievance Commission administrative hearings. In about 50% of the cases, the prisoner was afforded some or all of the relief requested.

PAP represents prisoners on judicial review of adverse Inmate Grievance Commission decisions (Md.Ann.Code art. 41, § 204F(*I*)) only in a few cases each year. PAP does not have the personnel to represent on appeal all of the petitioners whom it represented before the Commission or other prisoners who proceed *pro se* before the Commission and then request an attorney for appeal. In 1974, PAP attorneys

represented prisoners in about nine Grievance Commission appeals and had about eight such cases pending as of May 19, 1975. In 1975, PAP attorneys represented prisoners in about twelve Commission appeals.

PAP does not assist prisoners in filing their own Grievance Commission appeals except in about five cases each year in which PAP prepares *pro se* pleadings or provides prisoners with advice about procedural matters such as the proper court in which to file and time limitations relating to appeal. (Stipulation II, ¶ 1(C)(4)(a)–(c).)

### E. PAROLE REVOCATIONS AND PAROLE RELEASES

All parole revocation matters are presently handled by the ISD. (Paul Tr. at 32.) The ISD does not represent individuals at preliminary hearings held before the Parole Board or within the Department of Correction. However, after such hearings have been completed, the individual inmate is asked whether he desires counsel. If so, the Parole Board is notified and in turn notifies the ISD within three to four weeks after the preliminary hearing, but approximately ten days before any actual parole revocation hearing takes place. (Paul Tr. at 37.) Counsel is not usually appointed for such an inmate before the ISD is so notified. (Paul Tr. at 37–38.) Approximately 90% of such inmates charged with parole violations are confined in connection with another offense. (Paul Tr. at 40.) If an individual facing parole revocation writes to the ISD before the ISD is otherwise notified of an imminent revocation hearing, ISD will undertake representation of that individual from the date of his request. (Paul Tr. at 42.)

In the case of a Patuxent inmate, the ISD is notified when a parole revocation hearing will be held. If the inmate desires counsel, it will be afforded him whether or not he has had prior contacts with the MPD, provided the inmate meets indigency criteria. No individual has ever been denied representation in connection with a parole revocation hearing on the ground that he failed to satisfy indigency criteria. (Paul Tr. at 63.)

As to parole release hearings of incarcerated inmates, the MPD does not provide representation at the same in view of certain rules and regulations of the Board of Parole of the State of Maryland. (Paul Tr. at 49.) The MPD so advises inmates who request such assistance, but also advises them of their right to see the synopsis of the file which the Board will review at such hearing so that the inmate will have an opportunity to bring to the Parole Board's attention any errors and omissions in the same. The MPD will not otherwise "coach" an inmate in preparation for a parole hearing. (Paul Tr. at 49–50.)

The Collateral Proceedings Division of the MPD is notified when an individual is charged with probation violation in Baltimore City. The ISD thereupon interviews the individual and provides representation to him at the probation violation hearing. (Paul Tr. at 46–47.)

Since March of 1974, PAP has not provided representation to inmates in either parole revocation or parole release hearings. (Stipulation II, ¶ 1(c)(5); Stipulation I, Exh. 7, ¶ 5(b).) During the calendar year 1974, however, the PAP staff provided some legal advice to inmates with regard to parole matters on 82 occasions. (Stipulation I, Exh. 7, ¶ 5(d)(4).)

### F. PERSONAL, DOMESTIC AND OTHER CIVIL MATTERS

The Collateral Proceedings Division of the MPD provides representation in connection with certain violations of probation cases, non-support cases, and sanity hearings, and in that connection represents an inmate who requests counsel. (Paul Tr. at 47, 55; Stipulation I, Exh. 6, ¶ (c).) Inmates who contact the agency in connection with a divorce matter, however, are referred by the MPD to the PAP. (Paul Tr. at 55, 69.)

Neither the Legal Aid Bureau nor the PAP represents, advises or counsels prisoners in personal, domestic and other civil court matters such as divorces, tort cases

and contract actions except in emergency cases in which advice is given to a prisoner who may otherwise lose his right to claim a defense. (Stipulation II, ¶ 1(c)(6).)

In civil matters such as domestic problems, the University of Baltimore Law School Program will act as contact liaison with the inmate's attorney, assuming there is one. (Stipulation II, p. 6.)

21. This paragraph relates to workload of the MPD:

### A. COLLATERAL PROCEEDINGS DIVISION

During the calendar year 1974, in Baltimore City, the MPD terminated through hearings or otherwise approximately 100 cases per month. About 25 of those cases each month were post-conviction petitions or habeas corpus or coram nobis petitions challenging convictions or sentences. The principal sources of those post-conviction cases were the following: (a) cases filed in proper person by prisoners and referred by the court clerk to the MPD for investigation and possible representation (the MPD received 193 of those referrals from the Criminal Court of Baltimore during the period from July 1, 1974, through April 23, 1975); (b) letters, petitions or complaints mailed by prisoners to judges and referred by the judges to the MPD; (c) post-conviction petitions prepared and filed by ISD (see *supra*) and referred to the MPD for representation at a hearing; and (d) miscellaneous, such as a case referred by an appellate division Public Defender who believes some point about the case may merit post-conviction relief. (Stipulation I, Exh. 6, ¶ 6.)

In 1975, the Public Defender opened 327 files concerning possible post-conviction relief. Approximately 50% of those files were open at the end of that year. (Paul Tr. at 59–60.) The record does not indicate in how many instances in which such files were opened, post-conviction petitions were filed. (Paul Tr. at 60; Plaintiffs' Facts, ¶ 15.)

### B. INMATE SERVICES DIVISION

Prior to the inception of the Inmate Services program in January 1975, the Public Defender did not have the capability to, nor did it, provide any assistance to prisoners in preparing post-conviction petitions before they were filed in court. Attorneys from the Collateral Proceedings Division did represent prisoners in post-conviction cases all over the State, but only after the prisoners had filed petitions in proper person. (O'Ferrall Tr. at 12–13; Plaintiffs' Facts, ¶ 20.) The Collateral Proceedings Division presently provides representation in connection with handling cases instituted in some instances entirely *pro se* and in other instances by prisoners with the aid of Inmate Services. However, as in the past, the Collateral Proceedings Division does not assist prisoners in preparing *pro se* petitions before they are filed. The Collateral Proceedings Division also provides representation in cases involving probation violation, nonsupport, defective delinquency, coram nobis, habeas corpus and sanity. (Stipulation I, Exh. 6; O'Ferrall Tr. at 11–12; Plaintiffs' Facts, ¶ 21.)

Since its inception the ISD represented prisoners sentenced to the jurisdiction of the Maryland Commissioner of Correction and Patuxent Institution in the following categories and numbers of cases during the period from January 1, 1975 to December 31, 1975:

| | | |
|---|---|---|
| 1. | Detainers | 763 |
| 2. | Post-Conviction | 327 |
| 3. | Habeas Corpus | 16 |
| 4. | Parole Revocation Hearings | 412 |
| 5. | Miscellaneous | 385 |

The matters included under "miscellaneous" refer to ten civil grievances, seventy-two referrals from Legal Aid, twenty-seven referrals from Public Defender offices other than Baltimore City, and two hundred twenty-one cases involving a great deal of effort in obtaining "jail time credits" as a result of an Executive Order promulgated by Governor Marvin Mandel dated April 1,

1975.[4] The ISD has also referred to Legal Aid fifty-five cases which were beyond its jurisdiction. (Paul Affidavit, at 1.)

Further, the ISD has received an average of twenty letters a day from inmates confined in the various state institutions requesting legal assistance on various and sundry matters in addition to the four principal categories heretofore mentioned. Those inquiries did include several matters which, while not within the jurisdiction of the ISD, were referred to the proper organization from which the inmate might receive possible assistance. Every letter received is answered by the ISD. (*Id.* at 2.)

Counsel have additionally stipulated that the following statistics accurately reflect the activity of the ISD as of June 1976:

| | Carry Over | Received | Closed | Pending |
|---|---|---|---|---|
| Post-convictions | 265 | 37 | 40 | 262 |
| Detainers | 464 | 63 | 180 | 347 |
| Habeas corpus | 8 | – | 3 | 5 |
| Parole revocation hearings | 1 | 40 | 37 | 4 |
| Referrals to Legal Aid | – | 6 | 6 | – |
| Pre-trial status (jail time credit) | 284 | 25 | 27 | 282 |
| Miscellaneous (civil grievances) | – | – | – | – |
| Referrals from Legal Aid | – | 10 | 10 | – |
| Referrals other than District #1 | – | 12 | 12 | – |
| TOTAL | 1022 | 193 | 315 | 900 |

(Affidavit of Melvin C. Paul 8/12/76; *see also* Paul Tr. at 58–76.) Additionally, an inmate who writes to the MPD requesting legal assistance (apparently when such request for assistance falls within the ambit of the services provided by the MPD) will be interviewed within two to three weeks from the MPD's receipt of his letter (Paul Tr. at 75).

22. The following statistics indicate the nature of legal services provided by the PAP for the calendar year 1974 (the figures are approximate and are based on cases completed during the period):

a. Representation of clients by PAP attorneys in court (32):
1. State sentence motions (3)
2. State habeas corpus proceedings (6)
3. State post-conviction proceedings (1)
4. Federal habeas corpus proceedings (1)
5. Administrative agency appeals (9)
6. Federal appeals (4)
7. Other appeals (3)
8. Federal civil rights actions (2)
9. Forfeiture hearings (1)
10. Extradition hearings (1)
11. Divorce proceedings (1)

b. Representation of clients by PAP attorneys or law students at administrative agency hearings (100):
1. Maryland Inmate Grievance Commission (49)
2. Maryland Board of Parole (51)*

*Parole revocation hearing representation was provided until about March 1974 when the Office of the Public Defender assumed that activity.

c. Representation of clients by PAP attorneys, law students or legal assistants in cases which involved contact or negotiations with parties on behalf of clients or attempts to obtain what clients want by providing more assistance than only advice but less assistance than representation in court or at agency hearings (34).

d. Legal advice to clients by PAP staff (1073):

1. Advice concerning possible substantive grounds for challenging convictions or sentences. That advice may be given in person, but more often, it is given through a personal letter or form letter in response to prisoners' written requests for assistance (85).

2. Advice concerning the procedures and methods for challenging convictions and sentences. That advice is given to prisoners who request representation or assistance in litigating post-conviction or habeas corpus

4. Pursuant to that Executive Order, all prisoners in Maryland who were sentenced before July 1, 1974, are entitled to credit against their sentences for time spent in jail awaiting trial. Under an agreement between the Public Defender and the Division of Correction, the Public Defender is responsible for representing prisoners in cases in which they claim such credit. (Paul Tr. at 71–72.) In 1975, the Public Defender closed about 50–60% of its 221 pretrial jail time credit files. (*Id.* at 72.)

claims by mailing to them form letters and instructions prepared by the PAP for filing petitions in proper person. No advice is given concerning the substance of the claims. Those clients are also referred to the Office of the Public Defender (339).

3. Detainers (98)

4. Paroles (82)

5. Pretrial matters (16)

6. Prison conditions or administrative matters (88)*

7. Civil matters (63)*

8. Inmate Grievance Commission proceedings (97)*

> * The advice given to the prisoners in many of those 248 cases was that, despite the possible merit of their claims, the PAP did not have adequate staff and resources to represent the inmates or to prepare *pro se* petitions on their behalf.

9. Patuxent Institution/Defective Delinquents Act proceedings (12)

10. Miscellaneous (193)

(Stipulation I, Exh. 7, ¶ 5(d).)

e. Files were opened, but the cases were rejected by the PAP in 784 cases for the following reasons:

1. Clients ineligible because of already being represented by attorneys (91)

2. Cases which became moot or inactive or which were withdrawn by clients (365)

3. Cases referred to other agencies (328)
(a) Office of the Public Defender (117),
(b) Other (211).

Total cases involving Division of Correction inmates (1628); total cases involving Patuxent Institution inmates (101); total cases involving inmates in other institutions (260).

(Stipulation I, Exh. 7, ¶ 5(e)–(h).)

The following statistics indicate the number of requests for assistance and the cases opened by PAP:

| | 1974 | 1975 |
|---|---|---|
| January | 202 | 153 |
| February | 116 | 159 |
| March | 142 | 175 |
| April | 174 | 172 |
| May | 180 | |
| June | 131 | |
| July | 192 | |
| August | 134 | |
| September | 128 | |
| October | 160 | |
| November | 119 | |
| December | 141 | |
| Total | 1819 | |

(Stipulation I, Exh. 7, ¶ 6.) Additionally, PAP has recently received the following number of requests for legal services:

| | |
|---|---|
| July, August, September 1975 | 433 |
| October, November, December 1975 | 511 |
| January, February, March 1976 | 488 |
| April, May, June 1976 | 504 |

(Stipulation II, ¶ 1(B); Plaintiffs' Facts, ¶ 10(b).)

PAP cases pending before courts or administrative agencies as of May 19, 1975, were as follows:

a. Judicial proceedings (17)
  1. State court (5)
    (a) Appeal to the Court of Appeals (1)
    (b) Sentence motions (2)
    (c) Agency appeals (2)
  2. Federal court civil rights actions (12)

b. Administrative agency (herein the Inmate Grievance Commission proceedings (8).

PAP is unable to provide assistance or representation for all of the prisoners who request it. In making decisions about which cases to accept and which cases to reject, PAP considers its present staff and resources and the demand for services by prisoners. (Stipulation I, Exh. 7, ¶ 4.)

23. Counsel have stipulated as to the following statistics reflecting the activity of the Maryland Inmate Grievance Commission (IGC) for the period July 1, 1971 through March 31, 1975 (Stipulation I, Exh. 5):

A. * * *

| | |
|---|---|
| Complaints received | 2309 |
| Administrative dismissals | 1271 |
| Hearings | |
| Held meritorious | 267 |
| Held not meritorious | 606 |
| Held moot | 35 |
| Pending decision | 53 |
| Appeals (judicial review) | |
| Pending | 27 |
| Decided | 23 |

## B. Appeals (Judicial Review)

1. Baltimore City Court statistics (through April 23, 1975):

| | | |
|---|---|---|
| I G C appeals filed in proper person | | 13 |
| Affirmance | 2 | |
| Reversal | 0 | |
| Pending | 11 | |
| Pending for less than 3 months | 3 | |
| Pending for more than 3 months | 8 | |
| Pending for more than 6 months | 7 | |
| Pending for more than 1 year | 4 | |
| Pending for more than 2 years | 1 | |
| I G C appeals filed by PAP attorneys | | 19 |
| Affirmance | 4 | |
| Reversal | 6 | |
| Remanded | 3 | |
| Withdrawn | 2 | |
| Pending | 4 | |
| I G C appeals filed by attorneys other than PAP | | None |
| Total | | 32 |

2. Circuit Court for Anne Arundel County:

Through April 24, 1975, there have been about five or six IGC appeals filed, all of which were filed in proper person and are presently pending.

3. Circuit Court for Washington County (through April 24, 1975):

| | | |
|---|---|---|
| I G C appeals filed in proper person (all pending) | | 5 |
| I G C appeals filed by PAP attorneys | | 4 |
| Affirmance | 1 | |
| Reversal | 2 | |
| Pending | 1 | |
| I G C appeals filed by attorneys other than PAP | | None |
| Total | | 9 |

## C. IGC statistics for 1974:

| | |
|---|---|
| Number of grievances filed | 807 |
| Cases terminated | 813 |
| Judicial appeals filed | 25 |

24. The following statistics indicate the number of habeas corpus petitions filed in the Baltimore City Court by prisoners in the Maryland Division of Correction and at Patuxent Institution:

| | 1973 | 1974 |
|---|---|---|
| Division of Correction | | |
| Filed in proper person | 59 | 52 |
| Filed by attorney | 34 | 35 |
| Patuxent Institution | | |
| Filed in proper person | 40 | 14 |
| Filed by attorney | 4 | 3 |

(Stipulation I, Exh. 4, ¶ A.)

The following statistics indicate the number of post-conviction petitions filed in the Criminal Court of Baltimore City by prisoners in the Maryland Division of Correction and at Patuxent Institution:

| | 1974 | 1975 |
|---|---|---|
| January | | 19 |
| February | | 20 |
| March | | 20 |
| April | | 15 (through 4/23/75) |
| May | | |
| June | | |
| July | 23 | |
| August | 26 | |
| September | 23 | |
| October | 25 | |
| November | 18 | |
| December | 14 | |
| Total (July 1, 1974 through April 23, 1975) | | 203 |
| Total filed in proper person | | 193 |

(Stipulation I, Exh. 4, ¶ B.)

The Annual Report (1973–74) of the Administrative Office of the Courts of Maryland indicates the following statistics for all of the Circuit Courts of Maryland's counties for the period from July 1, 1973 to June 30, 1974:

| | Cases Filed | Cases Terminated |
|---|---|---|
| Habeas corpus petitions | 374 | 391 |
| Post-conviction petitions | 448 | 354 |
| Sentence review motions under art. 27, § 645JA–JG | 341 | 382 |

(Stipulation I, Exh. 4, ¶ C.)

25. The following statistics indicate the number of cases commenced in the United States District Court for the District of Maryland by state prisoners:

|  | State habeas | Civil rights | Other |
|---|---|---|---|
| Calendar year: |  |  |  |
| 1972 | 115 | 90 | -- |
| 1973 | 164 | 97 | -- |
| 1974 | 206 | 124 | -- |
| 1975 | 64 | 42 | 5 |
| (January through April) |  |  |  |
| Fiscal year: * |  |  |  |
| ended 6/30/71 | 227 | 97 ** | -- |
| `` 6/30/72 | 169 | 81 ** | -- |
| `` 6/30/73 | 142 | 118 | -- |
| `` 6/30/74 | 176 | 81 | 4 |

\* Source: Annual Report of the Director of the Administrative Office of the United States Courts

\*\* Listed as "mandamus and other"

(Stipulation I, Exh. 3, ¶ A.)

The Clerk of the United States District Court does not maintain any records which indicate the extent to which attorneys are appointed to represent *pro se* habeas corpus and civil rights litigants. The Annual Report of the Director of the Administrative Office of the United States Courts: Reports of the Proceedings of the Judicial Conference of the United States does, however, indicate statistics on payments made under the Criminal Justice Act ("CJA"). To summarize from several recent reports, representation by private attorneys under the CJA in the District of Maryland has been as follows:

|  | Habeas corpus | § 2255 petitions | Other (non-criminal) |
|---|---|---|---|
| Fiscal year 1972 |  |  |  |
| As of 6/30/72 [1] | 7 | 2 | 0 |
| As of 6/30/73 [2] | 8 | 3 | 0 |
| Fiscal year 1973 |  |  |  |
| As of 6/30/73 [3] | 3 | 4 | 0 |
| Fiscal year 1974 |  |  |  |
| As of 6/30/74 [4] | 6 | N.A. | N.A. |

1. Table 83, pp. 489–93 (1972 Report)
2. Exhibit B–1, pp. 521–25 (1972 Report)
3. Exhibit B–2, pp. 526–31 (1973 Report)
4. 1974 Report (Draft)

It should be noted that the number of appointments of attorneys in the habeas corpus cases indicated above includes appointments for federal prisoners as well as state prisoners. Although most *pro se* habeas corpus petitions filed in the District Court are by state prisoners, the following statistics indicate the number filed by federal prisoners:

| Fiscal year 1972 | 14 |
|---|---|
| Fiscal year 1973 | 5 |
| Fiscal year 1974 | 3 |

(Stipulation I, Exh. 3, ¶ B.)

The Clerk who on May 22, 1975 was responsible for filing the habeas corpus petitions, civil rights complaints and other actions by prisoners in Maryland confinement institutions had occupied that job since August 1974. It has been her experience over the nine-month period from August 1974 through April 1975, to her best recollection, that 99 to 100% of such actions filed in that period were submitted to the District Court by prisoners in proper person.

The District Court judges have the discretion to appoint attorneys to represent *pro se*, state prisoner litigants. For habeas corpus petitioners, the Court may appoint and compensate private attorneys under the Criminal Justice Act. Attorneys may also be appointed to represent civil rights plaintiffs; however, there is no provision for the payment of those attorneys. (Stipulation I, Exh. 3, ¶ B.)

The Maryland State Bar Association's Committee on Correctional Reform has on past occasions acted as a resource for the Judges of the United States District Court, to provide counsel to inmates in section 1983 cases. Counsel are appointed by the chairman and act on a voluntary basis, upon request made by such Judges. (Stipulation II, Exh. 9.)

## LAW

The First Amendment provides in part: "Congress shall make no law * * * abridging * * * the right of the people * * * to petition the Government for redress of grievances." Additionally, that right is guaranteed as an element of due process and may be asserted by persons held in confinement. In *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972), the Supreme Court, in a per curiam opinion, has cautioned and also stressed:

Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons", including prisoners. We are not unmindful that prison officials must be accorded latitude in the

administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the courts for the purpose of presenting their complaints." *Johnson v. Avery,* 393 U.S. 483, 485 [89 S.Ct. 747, 749, 21 L.Ed.2d 718]; *Ex parte Hull,* 312 U.S. 546, 549 [61 S.Ct. 640, 641, 85 L.Ed. 1034]. See also *Younger v. Gilmore,* 404 U.S. 15, [92 S.Ct. 250, 30 L.Ed.2d 142] aff'g *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.). * * *

In *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), Mr. Justice Powell, in addressing issues posed by California's "rules relating to censorship of prisoner mail and the ban against the use of law students and legal paraprofessionals to conduct attorney-client interviews with inmates" (416 U.S. *supra* at 398, 94 S.Ct. at 1804), wrote (at 419, 94 S.Ct. at 1804):

The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights. This means that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid. *Ex parte Hull,* 312 U.S. 546 [61 S.Ct. 640, 85 L.Ed. 1034] (1941).

Prior to both *Cruz* and *Procunier,* in *Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), Mr. Justice Fortas stated (at 485, 89 S.Ct. at 749):

Since the basic purpose of the writ is to enable those unlawfully incarcerated to obtain their freedom, it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed.
* * *

Such access to the courts by prisoners must be "reasonable" under all surrounding circumstances. *Hatfield v. Bailleaux,* 290 F.2d 632, 637 (9th Cir. 1961). It must also be "meaningful". *Hooks v. Wainwright,* 352 F.Supp. 163, 167 (M.D.Fla.1972).

Plaintiffs argue that in order for prisoners in Maryland's confinement institutions to have reasonable and meaningful access to the courts, prisoners must have available to them adequate law libraries. Plaintiffs also contend, *inter alia,* that the equal protection clause of the fourteenth amendment requires the provision of such libraries because indigents are otherwise effectively denied access to the courts available to those prisoners who can afford to pay for retained counsel or for the purchase of law books, solely because indigents lack the wherewithal to employ such counsel or to buy such books. *See* Mr. Justice Douglas' majority opinion in *Douglas v. California,* 372 U.S. 353, 355, 83 S.Ct. 814, 816, 9 L.Ed.2d 811 (1963): "There can be no equal justice where the kind of an appeal a man enjoys 'depends on the amount of money he has' ", quoting from Mr. Justice Black's plurality opinion in *Griffin v. Illinois,* 351 U.S. 12, 19, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

In *Smith v. Bounds,* 538 F.2d 541 (4th Cir. 1975), *cert. granted,* 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976), the contention was made that "by failing to provide [the plaintiffs, North Carolina prisoners] with adequate legal library facilities, the State was denying to them reasonable access to the Courts and equal protection of the laws as guaranteed by the First and Fourteenth Amendments." 538 F.2d *supra* at 542. The District Court required the State to submit a plan for adequate law facilities within North Carolina's confinement system, but refused to order a "legal defenders' program by way of a supplement to the library facilities * * *." *Id.* On appeal filed by both sides, Judge Russell, on behalf of the Fourth Circuit, affirmed the District Court's plan, with certain modifications. In so doing, he referred to "the constitutional obligation of the State to furnish *either* legal research facilities to the inmates of its

correctional system *or* an acceptable alternative therefor * * * ", *id.* (emphases supplied) and wrote (*id.* at 544):

> In cases which have arisen since the pioneer authority, *Gilmore v. Lynch* (N.D. Cal.1970) 319 F.Supp. 105, *aff'd sub nom. Younger v. Gilmore* (1971) 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 it has been generally assumed that adequate legal research facilities and an acceptable legal assistance program are to be thought of as alternatives and not as supplements to each other in the discharge of the State's obligation in this area. *See Kirby v. Ciccone* (8th Cir. 1974) 491 F.2d 1310, 1312; *Noorlander v. Ciccone* (8th Cir. 1973) 489 F.2d 642, 650–1; *Johnson v. Anderson* (D.Del.1974) 370 F.Supp. 1373, 1385; *cf. Ross v. Moffitt* (1974) 417 U.S. 600, 616–18, 94 S.Ct. 2437, 41 L.Ed.2d 341. We agree and are of opinion that the District Court correctly ruled that the State is under no constitutional duty to offer the inmates of its penal institutions both adequate legal research facilities and an independent attorneys' office, however helpful the dual service might be.[3]

> [3] Of course, the State would have the right, should it later determine that independent legal counsel for prisoners would be preferable to providing them adequate legal research facilities, to apply to the District Court for permission to adopt a legal counseling service in lieu of the library facilities, as now provided under the order of the District Court.

In *Davis v. Lewis*, 544 F.2d 514 (4th Cir. 1976), the Fourth Circuit, upon the authority of *Smith v. Bounds*, vacated the District Court's denial, prior to the filing of the Fourth Circuit of its opinion in *Smith*, of Davis' contention that his constitutional rights had been violated by North Carolina's failure to provide prison law libraries, and remanded the case for further consideration by the District Court.[5]

The "pioneer authority" referred to by Judge Russell, namely *Gilmore v. Lynch*, 319 F.Supp. 105 (N.D.Cal.1970), *aff'd sub nom., Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), was a case in which California's provision of certain legal resource materials for state prisoners was challenged. The three-judge District Court held that those materials were so insufficient that their limited provision constituted an unreasonable interference with the prisoners' right of access to the courts and a denial of equal protection to indigent prisoners. On direct appeal, the Supreme Court affirmed in a brief per curiam opinion, citing to *Johnson v. Avery, supra.*[6] In *Johnson*, Mr. Justice Fortas held constitutionally invalid a Tennessee prison regulation which provided in part:[7]

> No inmate will advise, assist or otherwise contract to aid another, either with or without a fee, to prepare Writs or other legal matters. * * *

In so doing, the Justice wrote (393 U.S. at 488–90, 89 S.Ct. at 750):

> Tennessee does not provide an available alternative to the assistance provided by other inmates. The warden of the prison

5. In *Davis*, the Fourth Circuit, noting the grant of certiorari by the Supreme Court in *Smith*, observed (slip op. at 8–9) that "whether *Smith* was correctly decided must await Supreme Court review. The district court should therefore delay consideration of this aspect of the case until the Supreme Court's decision in *Smith* is announced, and the district court should abide by what the Supreme Court decides." Herein this Court has determined not to delay its filing of this opinion in view of the fact that lengthy and very detailed presentations by counsel have been completed and that the issues are presented in factual and legal contexts somewhat different from those which prevailed in *Smith*.

6. Numerous other courts have held that law libraries or other alternative means to insure access by state or federal prisoners to the courts are required. *Cruz v. Hauck*, 515 F.2d 322, 332 (5th Cir. 1975); *Gaglie v. Ulibarri*, 507 F.2d 721 (9th Cir. 1974); *Hooks v. Wainwright*, 457 F.2d 502 (5th Cir. 1972); *Wilson v. Zarhadnick*, 406 F.Supp. 1195 (M.D.Ga.1975); *Padgett v. Stein*, 406 F.Supp. 287 (M.D.Pa.1975); *Craig v. Hocker*, 405 F.Supp. 656 (D.Nev.1975); *Johnson v. Anderson*, 370 F.Supp. 1373 (D.Del. 1974); *White v. Sullivan*, 368 F.Supp. 292 (S.D. Ala.1973); *see also Knell v. Bensinger*, 522 F.2d 720, 726 (7th Cir. 1975); *Page v. Sharpe*, 487 F.2d 567 (1st Cir. 1973); *Russell v. Oliver*, 392 F.Supp. 470 (W.D.Va.1975); *Farrington v. North Carolina*, 391 F.Supp. 714 (M.D.N.C. 1975).

7. Quoted in *Johnson v. Avery*, 393 U.S. at 484, 89 S.Ct. at 748.

in which petitioner was confined stated that the prison provided free notarization of prisoners' petitions. That obviously meets only a formal requirement. He also indicated that he sometimes allowed prisoners to examine the listing of attorneys in the Nashville telephone directory so they could select one to write to in an effort to interest him in taking the case, and that "on several occasions" he had contacted the public defender at the request of an inmate. There is no contention, however, that there is any *regular system of assistance* by public defenders. In its brief the State contends that "[t]here is absolutely no reason to believe that prison officials would fail to notify the court should an inmate advise them of a complete inability, either mental or physical, to prepare a habeas application on his own behalf," but there is no contention that they have in fact ever done so.

This is obviously far short of the showing required to demonstrate that, in depriving prisoners of the assistance of fellow inmates, Tennessee has not, in substance, deprived those unable themselves, with reasonable adequacy, to prepare their petitions, of access to the constitutionally and statutorily protected availability of the writ of habeas corpus. By contrast, in several States, the public defender system supplies trained attorneys, paid from public funds, who are available to consult with prisoners regarding their habeas corpus petitions. At least one State employs senior law students to interview and advise inmates in state prisons. Another State has a voluntary program whereby members of the local bar association make periodic visits to the prison to consult with prisoners concerning their cases. We express no judgment concerning these plans, but their existence indicates that techniques are available to provide alternatives if the State elects to prohibit mutual assistance among inmates.

Even in the absence of such alternatives, the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief: for example, by limitations on the time and location of such activities and the imposition of punishment for the giving or receipt of consideration in connection with such activities. Cf. *Hatfield v. Bailleaux*, 290 F.2d 632 (C.A. 9th Cir. 1961) (sustaining as reasonable regulations on the time and location of prisoner work on their own petitions). But unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners. [Footnotes omitted.] [Emphasis added.]

■ The record in *Smith v. Bounds* would seem to indicate that North Carolina did not unreasonably interfere with inmate mutual assistance.[8] However, whether or not the standards established by Judge Russell in *Smith* require provision of *either* law libraries *or* adequate legal assistance, *in addition to* any assistance available through mutual prisoner cooperation need not be decided in the cases at bar. Rather, the key issue in these cases is whether *Smith*'s alternative requirement of *either* law libraries *or* adequate legal assistance is *in any event* met by the State of Maryland's legal assistance programs. Concededly, Maryland's confinement institutions do not contain appropriate law libraries. Thus, the inquiry shifts to the question of whether or not Maryland's legal assistance programs pass muster under *Smith*. In that latter regard, the undisputed facts set forth *supra* speak for themselves. In most regards, Maryland does provide legal assistance to prisoners which, while like all things human, though surely not perfect, neverthe-

8. *See* Judge Larkin's Memorandum Opinion & Order filed in *Smith v. Bounds* on August 10, 1972. That document is set out in Supplemen-

tary Appendix pp. 7–8, to the Petition for Writ of Certiorari filed in that case in the Supreme Court, No. 75–915.

less constitutes a "reasonable" and "meaningful" "regular system of assistance".

■ What is "reasonable" and "meaningful" in that regard must be determined in any given case with an eye to the role which a federal court should play in considering issues relating to the administration of prisons. In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court struck down as violative of the right to access a California prison regulation which Mr. Justice Powell characterized (at 419, 94 S.Ct. at 1814) as imposing "an absolute ban on the use by attorneys of law students and legal paraprofessionals to interview inmate clients." Nevertheless, before invalidating that regulation, Mr. Justice Powell noted the ever-present need of the judiciary to keep well in mind the administrative problems of state prison officials, writing (at 420, 94 S.Ct. at 1814) that—

> * * * prison administrators are not required to adopt every proposal that may be thought to facilitate prisoner access to the courts. The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials. * * *

The year before, in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), in a case dealing with state prisoners' freedom of expression in the context of prison regulations limiting interviews between members of the news media and prisoners, Mr. Justice Stewart reversed and remanded for further proceedings the District Court's invalidation of California's efforts to reconcile prisoners' First Amendment rights with institutional security and disciplinary requirements. In so doing, Mr. Justice Stewart stated (at 822, 94 S.Ct. at 2804):

> We start with the familiar proposition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction

justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948). * * *

Mr. Justice Stewart also observed (at 826, 94 S.Ct. at 2806):

> [S]o long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, "prison officials must be accorded latitude." *Cruz v. Beto*, 405 U.S., at 321 [92 S.Ct. [1079] at 1081].

In *Gilmore v. Lynch, supra*, the three-judge District Court wrote (at 109) that "the basic test" in most cases for federal judicial review of state prison practices is that "the asserted interest of the State in enforcing its rule is balanced against the claimed right of the prisoner and the degree to which it has been infringed by the challenged rule."

In a number of cases in recent years the Supreme Court has highlighted the importance of principles of federalism and comity in weighing and balancing prisoners' rights on the one hand and state institutional needs on the other hand. Thus, Mr. Justice Stewart, in *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973), stressed that—

> It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State. Since these internal problems of state

prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems. \* \* \*

Cf. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ Although plaintiffs have not challenged the adequacy of representation afforded Maryland inmates in any category of case after counsel have been appointed, plaintiffs have questioned whether counsel are available in one or more categories of cases either at all or on a prompt basis. (*See* this Court's Memorandum and Order dated February 10, 1976; Paul Tr. at 64–66.) Plaintiffs have also emphasized that in section 1983 cases instituted in this Court, no program sponsored by the State of Maryland provides any legal assistance. But there would seem no constitutional mandate that Maryland so do. While there is seemingly no holding to that effect by any court, guidance would appear to be available in *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). In that case, the Supreme Court rejected the claim that a state must provide counsel for an indigent defendant seeking certiorari review in the Supreme Court of his state court conviction. One of the grounds relied upon by Mr. Justice Rehnquist in his majority opinion for that rejection, *i.e.,* the discretionary nature of Supreme Court review, is inapplicable herein. But other reasons and words in that opinion are most significant in the context of the within cases (at 617–18, 94 S.Ct. at 2447):

There is also a significant difference between the source of the right to seek discretionary review in the Supreme Court of North Carolina and the source of the right to seek discretionary review in this Court. The former is conferred by the statutes of the State of North Carolina, but the latter is granted by statute enacted by Congress. Thus the argument relied upon in the *Griffin* and *Douglas* cases, that the State having once created a right of appeal must give all persons an equal opportunity to enjoy the right, is by its terms inapplicable. *The right to seek certiorari in this Court is not granted by any State, and exists by virtue of federal statute with or without the consent of the State whose judgment is sought to be reviewed.*

*The suggestion that a State is responsible for providing counsel to one petitioning this Court simply because it initiated the prosecution which led to the judgment sought to be reviewed is unsupported by either reason or authority.* It would be quite as logical under the rationale of *Douglas* and *Griffin,* and indeed perhaps more so, to require that the Federal Government or this Court furnish and compensate counsel for petitioners who seek certiorari here to review state judgments of conviction. Yet this Court has followed a consistent policy of denying applications for appointment of counsel by persons seeking to file jurisdictional statements or petitions for certiorari in this Court. See, e.g., *Drumm v. California,* 373 U.S. 947 [83 S.Ct. 1683] (1963); *Mooney v. New York,* 373 U.S. 947 [83 S.Ct. 1678] (1963); *Oppenheimer v. California,* 374 U.S. 819 [83 S.Ct. 1860] (1963). In the light of these authorities, it would be odd, indeed, to read the Fourteenth Amendment to impose such a requirement on the States, and we decline to do so. [Emphases added.]

To paraphrase Mr. Justice Rehnquist, it may well be that a state is not responsible for providing counsel to one who institutes a 1983 case in a federal district court simply because the state may have initiated the actions or lack of actions within its confinement system which led to the allegations set forth in the 1983 complaint. But the final determination of that issue need not be made herein. To date, each judge, active or senior, presently serving in this Court, has been able to find and to appoint counsel—usually without compensation—to provide at least adequate, and often outstanding, representation to plaintiffs who are confined in Maryland institutions in every 1983 and other case in which such ap-

pointment appeared needed to assure the type of justice mandated by the standards established by the Supreme Court, strictly monitored by the Fourth Circuit, and carefully followed by the Judges of this Court.[9] Accordingly, the non-provision of that legal assistance by the State of Maryland does not require Maryland to establish, in addition to its present legal assistance programs, law libraries within its confinement institutions, in order to provide to prisoners in Maryland's confinement institutions access to this Court in 1983 and other cases, as required by the First and Fourteenth Amendments.

█ There remains plaintiffs' equal protection claim that because certain of Maryland's prisoners can afford to pay for *both* legal assistance *and* legal research materials, the State must provide indigent prisoners with both legal assistance and law libraries. To begin with, *Smith v. Bounds* speaks to the contrary. Further, in its somewhat different context, *Ross v. Moffitt* suggests to the contrary. Therein, in addition to the language quoted *supra* at 779, Mr. Justice Rehnquist wrote:

Despite the tendency of all rights "to declare themselves absolute to their logical extreme," there are obviously limits beyond which the equal protection analysis may not be pressed without doing violence to principles recognized in other decisions of this Court. The Fourteenth Amendment "does not require absolute equality or precisely equal advantages," *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24 [93 S.Ct. 1278, 1291, 36 L.Ed.2d 16] (1973), nor does it require the State to "equalize economic conditions." *Griffin v. Illinois*, 351 U.S., at 23 [76 S.Ct. [585] at 592] (Frankfurter, J., concurring). It does require that the state appellate system be "free of unreasoned distinctions," *Rinaldi v. Yeager*, 384 U.S. 305, 310 [86 S.Ct. 1497, 1500, 16 L.Ed.2d 577] (1966), and that indigents have an adequate opportunity to present their claims fairly within the adversary system. *Griffin v. Illinois,* supra; *Draper*

*v. Washington*, 372 U.S. 487 [83 S.Ct. 774, 9 L.Ed.2d 899] (1963). The State cannot adopt procedures which leave an indigent defendant "entirely cut off from any appeal at all," by virtue of his indigency, *Lane v. Brown*, 372 U.S. [477], at 481, [83 S.Ct. 768, at 771, 9 L.Ed.2d 892] or extend to such indigent defendants merely a "meaningless ritual" while others in better economic circumstances have a "meaningful appeal." *Douglas v. California*, supra, [372 U.S.] at 358 [83 S.Ct. [814] at 817]. The question is not one of absolutes, but one of degrees. In this case we do not believe that the Equal Protection Clause, when interpreted in the context of these cases, requires North Carolina to provide free counsel for indigent defendants seeking to take discretionary appeals to the North Carolina Supreme Court, or to file petitions for certiorari in this Court. [417 U.S. at 611–12, 94 S.Ct. at 2444 (footnote omitted).]

\*   \*   \*   \*   \*   \*

This is not to say, of course, that a skilled lawyer, particularly one trained in the somewhat arcane art of preparing petitions for discretionary review, would not prove helpful to any litigant able to employ him. An indigent defendant seeking review in the Supreme Court of North Carolina is therefore somewhat handicapped in comparison with a wealthy defendant who has counsel assisting him in every conceivable manner at every stage in the proceeding. But both the opportunity to have counsel prepare an initial brief in the Court of Appeals and the nature of discretionary review in the Supreme Court of North Carolina make this relative handicap far less than the handicap borne by the indigent defendant denied counsel on his initial appeal as of right in *Douglas*. And the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by

---

**9.** All of those Judges have authorized the inclusion of the last sentence.

a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process. We think respondent was given that opportunity under the existing North Carolina system. [417 U.S. at 616, 94 S.Ct. at 2446.]

Finally, it must be noted that there are some instances in state and federal cases other than those brought under 1983 in which prisoners in Maryland's confinement institutions are not able to procure counsel except by special action by a court and that in many instances meaningful assistance is not available to indigent prisoners in connection with their legal preparation of documents for filing in court. That initial lack may sometimes be quite harmful—and should be eliminated or reduced as Maryland's relatively new prisoner assistance programs become of age. Clearly, the totality of those programs described *supra* can be improved. But on balance, the record in these cases, considered together with this Court's knowledge of its own experience in 1983 and other cases, demonstrates that an indigent prisoner does have "an adequate opportunity to present his claims fairly" in Maryland's courts, in this Court, and in appeals therefrom, and that there presently exists in Maryland "an acceptable legal assistance program" and thus an acceptable alternative to adequate legal research facilities. Accordingly, the alternate test established by *Smith v. Bounds* is met by and in the State of Maryland. Accordingly also, defendants are entitled to the grant of summary judgment herein.

APPENDIX A

A. MARYLAND DIVISION OF CORRECTION    EXHIBIT 1

| Institution | Location | Population [1] | Average [2] Stay [*] | Security Classification |
|---|---|---|---|---|
| Maryland Penitentiary | Baltimore | 982 [3] | 8½ years | Maximum |
| Reception, Diagnostic and Classification Center | Baltimore | 567 [4] | 90 days | Maximum |
| Maryland House of Correction | Jessup [5] | 1763 | 2 years | Medium |
| Maryland Correctional Institution | Hagerstown [6] | 894 | 18 months | Medium |
| Maryland Correctional Training Center | Hagerstown | 1082 | 10–12 months | Medium |
| Maryland Correctional Camp System | Dispersed throughout the State (6 locations) | 1199 | 4 months | Minimum |
| Community Corrections Centers | Baltimore | 148 | 4 months | Minimum |
| Maryland Correctional Institution for Women | Jessup | 222 | 6–9 months | Medium |

PATUXENT INSTITUTION
1. Location: Jessup, Maryland
2. Population: Diagnostic status          108
               Committed status          384
                         Total          492
3. Average stay: 4.7 years
4. Security Classification: Maximum

1. Population as of midnight August 11, 1976.
2. "Adult Corrections in Maryland," League of Women Voters. December, 1973
3. Includes 11 prisoners at University of Maryland Hospital.
4. Includes 82 prisoners temporarily at Patuxent Institution in space leased by the Division of Correction. Does not include 200 to 250 prisoners at local jails who have been sentenced and who are waiting for transfers to the Division.
5. Jessup is about 15 miles from Baltimore.
6. Hagerstown is about 80 miles from Baltimore.

* The average stay for a prisoner in the Division of Correction is 26 months.